**Sheldon STEINBERG et al., Appellants,**

**v.**

**Lamont J. SEITZ and John G. Bowen, Appellees.**

**Patent Appeal No. 75–524.**

United States Court of Customs and Patent Appeals.

June 26, 1975.

Francis A. Utecht, Long Beach, Cal., Anthony A. O'Brien, Washington, D. C., attorneys of record, for appellants.

Richard R. Trexler, Chicago, Ill. (Olson, Trexler, Wolters, Bushnell & Fosse, Ltd., Chicago, Ill.), attorney of record, for appellee.

Before MARKEY, Chief Judge, and RICH, BALDWIN, LANE and MILLER, Associate Judges.

BALDWIN, Judge.

Steinberg et al. (hereinafter Steinberg) appeal from that portion of the decision of the Board of Patent Interferences which awarded priority of count 3 to Seitz et al., the junior party.[1] We affirm.

## The Subject Matter

The count in issue reads:

3. Apparatus for use in determining the prothrombin time [clotting time] of a blood sample comprising: a container for holding the blood sample, a freely movable ferromagnetic member disposed in the container, a magnetic field source located near the container and forming a weak magnetic couple with the ferromagnetic member, means for producing relative movement between the ferromagnetic member and the container, the intensity of the magnetic field source being sufficient to prevent relative movement between the ferromagnetic member and the magnetic field source prior to clotting but insufficient to prevent relative movement between the ferromagnetic member and the magnetic field source on clotting due to an increase in the resistance to movement of the ferromagnetic member in the container imposed on the ferromagnetic member by the blood sample, and means for deriving a signal in response to relative movement between the ferromagnetic member and the magnetic field source, the signal signi-

fying the end point in determining the prothrombin time.

The recited apparatus is used for determining the length of time required for a patient's blood to clot. Such information is useful in the treatment of the disease of hemophilia and other congenital or acquired bleeding disorders.

## The Record

Steinberg took no testimony, but relied upon his October 20, 1967, filing date. Seitz et al. took testimony and introduced evidence to prove prior actual reduction to practice. The testimony includes that of one of the co-inventors, Seitz, and Owen, a graduate electrical engineer, who constructed a clot timer on behalf of Seitz et al. During the pertinent period, Seitz et al. were employed by the Hyland Division of Travenol Laboratories, the latter being the operating subsidiary of Baxter Laboratories, which is the assignee of the Seitz et al. application. Owen was the owner of Owen Laboratories, which, in July of 1966, became a division of Berkleonics Corporation. At the time his testimony was taken, Owen was an employee of the Burroughs Corporation.

Owen testified about the work he performed on behalf of Seitz et al. and the report he wrote concerning that work. Owen stated that his instructions on what he was supposed to build and how he was to build it were received from Bowen. The report, dated February 9, 1967, was written by Owen and covered his activities prior to that date, particularly "the fall of 1966 and the winter of '66–'67." The report also included a photograph of the device, built by Owen himself, which is discussed in the report. Owen described the clot timing device by referring to that photograph, and, as described by him, the device shown in that

---

1. The involved Steinberg patent is Patent No. 3,520,659, granted July 14, 1970, on application serial No. 676,820, filed October 20, 1967. Seitz et al. are involved through application serial No. 156,740, filed June 25, 1971, as a continuation-in-part of application serial No. 846,992, filed June 13, 1969, which is a contin-

uation-in-part of application serial No. 738,382, filed June 17, 1968. Count 3 was copied, along with two other counts, from the Steinberg patent. Priority of the other two counts was awarded to Steinberg, since Seitz et al. failed to take testimony on those counts.

photograph is within the scope of count 3. Owen further testified that, although Bowen suggested using a steel ball as the "freely movable ferromagnetic member disposed in the container", he used a flat steel disc with holes in it as the "ferromagnetic member."

With regard to the testing of the device, Owen testified as follows:

Q52. Now, in your work on this device did you find that the results were satisfactory or unsatisfactory, and did or did not the mechanism do the job which you intended it to do? A. Extremely satisfactory. It worked out so well that we, of course, having done the development, were extremely pleased, and Hyland, as represented by John Bowen, were elated at the possibilities for an instrument which opened up with this initial success.

Q53. Under paragraph C on page two under the title "Clot Detection" can you explain that a little bit, as to what that mechanism was, particularly with reference to the paragraph, if it is there shown? A. Well, when we first started working with the clot detector our main interest was in just seeing if the clot would stop the movement of a metal piece, and of course, we could tell that just by watching it. But, of course, for a finished instrument you don't want to have to watch one, or perhaps a line of these things operating, and so our purpose, eventual purpose, had to be to come up with a means of electrically, preferably electrically, perhaps optically, detecting the stoppage of motion, and preferably in such a way that it would print out on the little printout that Hyland intended to incorporate into its systems. So we felt our obvious path here, being electrical people, was to work with electrical signals, and so upon consideration of the problem I thought it would most easily be done by wrapping a test coil, auxiliary coil, around one leg of the electromagnets, and see what sort of system—what sort of signal was induced in the test coil when the motion stopped.

My first test then consisted of connecting this test coil to an ordinary laboratory oscilloscope; and sure enough! I could see on the screen of the oscilloscope that a quite sizable voltage was induced when clotting took place.

Q54. Now, that's the coil that you previously designated by reference numeral on page four? A. Numeral 18.

Q55. Yes, that's the coil? A. The coil, number 18.

Q56. Now, did you then go past the oscilloscope stage? A. Oh, yes. An oscilloscope, of course, is an engineer's tool and not a clinical technician's apparatus, so I took a meter—

Q57. Which is shown in the photograph? A. Which is number 20 in the photograph.

Q58. Please proceed. A. Put it in a cardboard box, because of economy and need for speed. As I remember, I made a simple semi-conductor rectifier bridge to convert the a.c. which is induced in the coil, into d.c., which would move the meter, connected it up and found that sure enough! When the blood clot formed it stopped the disc, induced the voltage in the test coil, which then caused the meter pointer to kick over quite decidedly, and in such a manner that a nonelectrical person could easily tell that clotting took place.

Q59. In paragraph D, the title of which is "Effect of Agitation", I believe you previously mentioned something about that, but please explain, if you will, just what you did there? A. Well, of course, the proof of the pudding is the eating, and what you are doing in the electrical lab is not good enough to convince clinical people, so we took the basic elements of our system over to the Hyland Glendale plant. In working with one of their technicians one afternoon we made up quite a lot of clotting samples, measured their clotting time, using conventional methods and agitation and a stopwatch, and got an average of—

Q60. These were blood samples?
A. Yes, plasma, blood plasma samples.

Q61. Please proceed. A. Got an average of, I say here in the report, of some 11.8 seconds. Then from the same lot of plasma we conducted a series of tests, using the machine, and came out with some 12 seconds, or so, as the clotting time. We considered this to be a satisfactory indication of success, because the difference was, in our opinion, quite insignificant.

Because of the inconvenience of carrying a lot of stuff over to Hyland and getting it in and out of the car and so on—I don't like to pack things around in large number—I didn't take the meter. We simply watched for a stoppage of motion, and when we detected it visually then snapped the stopwatch.

### The Board

The pertinent portions of the board opinion are as follows:

In sum, as we view the testimony of Owen, he tested the device at least twice, once at Berkleonics, i. e., the Owen division thereof and then later at Hyland. The latter testing was done without the meter; the former with an oscilloscope. In both cases, the operation of the device was considered successful by Owens, although the oscilloscope is not referred to in the Owens report, Exhibit A–3. Significantly on page 1 of said report Owen concluded in A–1(b). under A. Summary that the resulting absence (or reduction) of motion when coagulation occurs can be detected quickly and reliably by external means, *electrical or otherwise,* (emphasis added).

In conclusion, then, we are of the opinion that at a time prior to February 9, 1967, the invention of the count in issue was reduced to practice by Owens on behalf of Seitz and Bowen,

the joint inventors at Berkleonics where the signal induced in the test coil was visible on the screen of the oscilloscope so as to indicate that clotting took place.

Steinberg urges that the Owen device of Figure 1 was not used in the tests but only a portion of same, referring to the fact that the reduced motion of the disc was detected *by observation rather than electrically.* This argument, however, ignores the testimony of Owen to the effect that electrical detection (the oscilloscope) was employed by Owen prior to the time he took the device to Hyland without the meter referred to supra. By the time he took the device to Hyland he had already established, to our satisfaction, an actual reduction to practice of the invention of the count.

Moreover, although a meter was not used at Hyland, it was indicated at paragraph C–1, page 2 of the report that indication of the time at which coagulation occurred had been obtained by means of an auxiliary coil encircling the magnetic field and a voltage change large enough to be used for signal purposes is induced in such a coil after clotting. Since the work at Hyland involved detection by observation rather than electrically, in our opinion, the use of a coil in paragraph C–1 *had to relate to the earlier work done by Owen at Berkleonics* and therefore, the report Exhibit A–3 in our opinion covers the use of the coil as the "means for deriving a signal in response to relative movement between the ferromagnetic member and the magnetic field source, the signal signifying the end point in determining the prothrombin time," the last limitation in the count.

In response to Steinberg's argument[2] that Seitz et al. abandoned, suppressed, or concealed the Owen device, and that

---

**2.** This argument was predicated upon the fact that the Seitz et al. grandparent application filed June 17, 1968, and the parent application filed June 13, 1969, did not disclose the disc concept present in the device of the Owen report. It was not until the involved Seitz et al. application, filed June 25, 1971, after the issue date of the Steinberg patent, that the use of a steel disc was disclosed.

Seitz et al. were "spurred into activity" by the Steinberg patent, the board stated:

> In the first place, as to spurring, since the effective date of Seitz et al., undisputed by Steinberg, is June 17, 1968 the filing date of the grandparent application and long before the Steinberg patent issued, the argument is untenable on its face.

> With regard to the argument relative to abandonment, suppression or concealment *of the invention of the count*, since the count reads on either the ball or disc concepts, we are unable to ascertain any merit in the Steinberg contention since, as we see it the *invention of the count was* never suppressed, abandoned, or concealed by Seitz et al. under 35 U.S.C. 102(g). We are unaware of any authority to support such contention nor has Steinberg directed us to any authorities in support of his contention insofar as it applies to the facts in this case.

*Opinion*

■ On appeal the bulk of appellants' brief has been devoted to the argument that Seitz et al. failed to establish that the Owen device was capable of successfully performing the work for which it was intended, insofar as appellants contend that the tests of the device conducted by Owen were insufficient to meet that standard. Specifically, appellants urge that for an actual reduction to practice it was necessary for Seitz et al. to have tested their device:

(1) with both normal and abnormal individuals,

(2) many times on a great many different plasmas, and

(3) that the results of such tests be amassed statistically.

Furthermore, appellants argue that it was necessary for Seitz et al. to have proven that the results obtained with the Owen device compared favorably with blood clotting times obtained by the prior art method.[3]

We have considered these arguments, but are convinced that they are untenable. The testing which appellants contend is necessary, we believe, would be necessary for commercial refinement of the Owen device, but not for establishing an actual reduction to practice. As we stated in *In re Dardick*, 496 F.2d 1234, 1238 (CCPA 1974):

> To prove a reduction to practice, all that must be shown is that the invention is suitable for its intended purpose. See *Voisinet* v. *Coglianese*, 455 F.2d 1064, 59 CCPA 958 (1972) and *Knowles* v. *Tibbetts*, 347 F.2d 591, 52 CCPA 1800 (1965). There is no requirement for a reduction to practice that the invention, when tested, be in a commercially satisfactory stage of development. See *In re Anthony*, 414 F.2d 1383, 56 CCPA 1443 (1969).

As to appellants' other argument relating to the necessity for using a meter when testing the Owen device, we are in agreement with the board's response thereto.

Appellants make the novel argument that Seitz et al. should be estopped from relying upon the Owen device as an actual reduction to practice, since appellants contend that Owen's steel disc concept was abandoned,[4] suppressed, or concealed within the meaning of 35 U.S.C. § 102(g).[5]

---

**3.** This method was referred to as the "normal manual" method.

**4.** Appellants do not appear to be arguing that Seitz et al. abandoned the Owen device, as evidenced by their reliance solely upon *Young* v. *Dworkin*, 489 F.2d 1277 (CCPA 1974), which involved only suppression and concealment under 35 U.S.C. § 102(g).

**5.** We believe this argument to be novel insofar as normally a party contends that the entire subject matter of a count, rather than just one element which a generic limitation of the count reads upon, has been suppressed or concealed. Noting that "a copied claim forming a count in an interference must be given the broadest construction which its language will reasonably permit," *Gubelmann* v. *Gang*, 408 F.2d 758, 56 CCPA 1013 (1969), we agree with the board that the "ferromagnetic member" limitation of the count reads upon both a steel disc and a steel ball.

 Although we disagree with the board's reasoning underlying its holding on this point, we do agree with its result in holding that there was no abandonment, suppression or concealment. The board flatly stated that the *"invention of the count was* never suppressed, abandoned, or concealed by Seitz et al. under 35 U.S.C. § 102(g)." (Emphasis in original). However, the language of 35 U.S.C. § 102(g) [6] does not speak in terms of the "invention of the count," but rather only "the invention." What then does that term mean in the phrase "the invention was made in this country by another who had not abandoned, suppressed, or concealed it"? We believe that it means any *embodiment* of the claimed subject matter. See Janicke, "The Varied Meanings of 'Invention' in Patent Practice: Different Meanings in Different Situations," *Patent Law Perspectives* (App. 1). Thus, the board was incorrect to the extent that Steinberg *could* prevail in this interference if they could prove that "the invention"—the embodiment of the subject matter of the count wherein the "ferromagnetic member" is a steel disc—had been suppressed or concealed. If this fact were to be proven, then Seitz et al. would not be allowed to rely upon the actual reduction to practice of the Owen device for priority purposes.

 However, the burden was upon Steinberg to prove suppression or concealment by a preponderance of the evidence. *Young* v. *Dworkin*, 489 F.2d 1277 (CCPA 1974). On the record before us, we cannot hold that this burden has been met. The record is replete with evidence showing continuous ongoing activity to put the clot timer of Seitz et al. on the market, albeit the decision was made to use the steel ball concept in the commercial embodiment. Furthermore, as appellee succinctly points out, "obviously, the commercial embodiment could not employ both [the steel ball and steel disc]." We further note that the Seitz et

al. grandparent application did not intend to restrict the subject matter to only the steel ball embodiment insofar as it stated that "a steel ball, or other appropriate magnetic member" was to be used. All that appellant has shown is mere delay, which without more, is not sufficient to establish suppression or concealment. *Young* v. *Dworkin*, supra.

Appellants mistakenly contend that:

[T]he party Seitz et al. must prove reasonable diligence from just prior to October 20, 1967 (the filing date of Party Steinberg et al.) up to the filing date of the earliest application of Party Seitz et al., i. e. Serial No. 738,382, filed June 17, 1968.

Suffice to say that since Seitz et al. are held to have established an actual reduction to practice prior to Steinberg's filing date, the question of diligence does not arise. It is of importance only when the party, who is first to conceive, does not reduce his invention to practice until after the other party has done so. 35 U.S.C. § 102(g); see *Hull* v. *Davenport*, 90 F.2d 103, 24 CCPA 1194 (1937).

For the foregoing reasons, the decision of the Board of Patent Interferences is *affirmed.*

*Affirmed.*

---

6. 35 U.S.C. § 102(g) reads:

(g) before the applicant's invention thereof *the invention was made in this country by* *another who had not abandoned, suppressed, or concealed it.* * * * [Emphasis supplied.]